3-0-4, Rosemary McCoy et al. v. Governor of the State of Florida. Nancy Abudu, representing the appellants in this case, Rosemary McCoy and Sheila Singleton. Ms. McCoy and Ms. Singleton are African-American women who have passed felony convictions. They have satisfied prison, parole, and probation. And after the passage of Florida's Amendment 4, which automatically restored voting rights to people who had satisfied those terms of their sentences, Ms. McCoy and Ms. Singleton voted in their local elections in May of 2019. They did so without any obstacle to the ballot box, and they did so without any detrimental effect to the state. They are income women of color, which means that they are not less likely but actually the least likely of those within the class of people with criminal convictions to be able to satisfy fully their legal financial obligations in order to vote in Florida. And for Ms. McCoy and Ms. Singleton, this is not a temporary barrier to accessing the ballot box. Because of the significant amount of money that they owe in legal financial obligations, it actually results in them almost never, ever being able to vote again. The state's so-called interest in rehabilitation cannot be reasonably satisfied if it cannot be realistically achieved. The evidence that we presented during trial, which the defendants never rebutted, they didn't present any evidence to rebut any of the facts that we showed, which include that one quarter of Black women in Florida live below the poverty line, that Black women in Florida with a criminal conviction face an unemployment rate of 43 percent, that women who enter the criminal legal system actually enter the system at an economic disadvantage as compared to almost any other socioeconomic class that is also part of the legal system. That means that they make or enter the legal system making less money than their white male counterparts, Black male counterparts, and even their white female counterparts. Black women in the criminal justice system in Florida are at the bottom. Mr. Buda, let's take all of those facts as given. One of your arguments with regard to both claims, the Equal Protection Claim and the 19th Amendment Claim, is that the district court erred by requiring you to prove intentional discrimination, right? Correct. Okay, so if I could talk to you about those two. And with regard to equal protection, let me tell you what I perceive about the case so far. I think that there are a fair number of cases in the circuit, as you've identified, that indicate that when you're dealing with an equal protection claim that goes to voting, you don't have to prove discriminatory intent. Okay, for example, our Lee case from 2019. On the other hand, there are cases in the 11th Circuit involving felon reenfranchisement challenges where we've said and the Supreme Court has said that you do need to prove discriminatory intent. And if we have to sort of figure out how to make all those cases fit, we have to apply the closest analogies. How do we get around cases like Hanvey-Scott, Johnson v. Governor, and the Supreme Court's decision in Hunter v. Underwood? All of which say in felon reenfranchisement or disenfranchisement scenarios that you have to prove discriminatory intent. So as an initial matter, Your Honor, I would say that the U.S. Supreme Court has actually never held that in terms of you have to prove discriminatory intent when challenging a disenfranchisement scheme or reenfranchisement scheme. Hunter v. Underwood says that. Well, Hunter v. Underwood was a case in which Alabama enacted its felon disenfranchisement law for the specific purpose of disenfranchising African Americans. Understood. And that's why the court said that the scheme would have to fall. Correct. But in a situation, especially involving women and other classifications, the Supreme Court has also recognized that you can look not only to the language or the letter of the restriction, but also behind it, which is why, for example, we have focused on in the 19th Amendment context, the phrase not only denial, but also a bridge, because a bridge gets us behind the actual letters of the law and allows for challenges to restrictions that may be facially unconstitutional, not only facially unconstitutional, but also unconstitutional as applied. And so I would say that Hunter, to some extent, is restricted because that was clearly a discriminatory intent claim. But it does not mean that the Equal Protection Clause only protects laws that intentionally discriminate against individuals. It also protects against laws that have the effect of discriminating or making it more difficult for certain categories of people to vote, which is why we point this court back to... I'm not sure that you're right about this, but let's assume you're right about Hunter v. Underwood. What do you do about our decisions in Hann v. Scott and Johnson v. Governor, which expressly hold and apply a discriminatory intent requirement with challenges to felon disenfranchisement or reenfranchisement schemes? Well, with Hann, I would note that that case actually was mooted by the passage of Amendment 4. In my recollection, Your Honor... It was good law at the time. I mean, the fact that something later moots out the controversy doesn't mean that an opinion that was issued loses its precedential effect. By the way, let me say I think you've written a really good brief in this case, but I just think you're running up against a wall of precedent that we as an intermediate appellate court can't penetrate. Well, I thank you very much for that, Judge Jordan. I would again direct this court to Justice Scalia's concurring opinion in Crawford, where he sets the test very clearly. If a plaintiff is challenging an election law, which we are, that imposes a voter qualification, which we are, the sliding scale, undue burden standard under Anderson-Burdick line of cases is what applies. And under that undue burden standard, we have established that the magnitude of the injury here is that our clients will almost never be able to vote again. The state's assertive interest is in rehabilitation. However, we've already presented several facts showing that our clients enter the criminal justice system at an economic disadvantage and face an even greater disadvantage when they exit the criminal justice system. So there's absolutely no way that the state's interest of rehabilitation through the payment of money could ever be satisfied in this circumstance. In our en banc decision in Jones, the court said that the reenfranchisement does not affect the fundamental right to vote because it's not whether to give someone the franchise, but it's whether to give it back. How does that impact your argument? Well, of course, we disagree with that aspect of the court's decision, but we would also note and put special emphasis on Section 3B2 of the court's decision in which there was emphasis on the fact that, again, if indeed a voter qualification is discriminating against a class of people solely based on their identity, that indeed does require some level of scrutiny, that felon reenfranchisement laws are not completely immune from constitutional review simply because they are in the felon disenfranchisement or reenfranchisement scheme. And here we also highlight that we are not just bringing a case on behalf of wealth, which was the only issue or category at issue in the Jones 2 case. We are bringing a claim that is an intersectionality argument, noting that our clients, because of their race, because of their class, and because of their gender, are definitely entitled to heightened scrutiny. And we know that if this court looks to and finds persuasive the laws involving gender-related restrictions or race-related restrictions, and for our clients who represent all of those multiple identities, we think that it is well within this court's authority to impose a more strict or heightened level of scrutiny. Turning to the 19th Amendment, you've cited a lot of academic commentary and history about why the 19th Amendment should be interpreted in the same way. But the language of that amendment is very similar, if not identical, except for gender and race, sex and race. With the 15th Amendment, which has been held to require intentional discrimination, how do we interpret an amendment with identical or similar language differently? I would pull in, and I realize I'm running out of time, I would pull in the 26th Amendment as well, which uses the phrase on account of. However, we know that even with the 26th Amendment in existence, it is not unconstitutional to deny 17-year-olds the right to vote. However, we do know that it is unconstitutional to deny someone categorically the right to vote based on race or gender. However, again… But this is not a categorical denial. You phrase it as a disparate impact based on the evidence you presented, but it's not a categorical denial to black women. Exactly, and I mentioned that, Your Honor, to show that that is only one, but not the only, type of prohibition that the 19th Amendment speaks to. We also cite to the scholarly articles and other history because we do not have a significant amount of jurisprudence in this area of law, which is why it is a matter of first impression, and there is no case or other authority that would prohibit this court from imposing a heightened level of scrutiny as to Senate Bill 7066, or at least borrowing from the undue burden standard that is currently used in the 14th Amendment, and which is the amendment most analogous in terms of interpretation of how the 19th Amendment should be applied. At this point, I'll reserve the rest of my time. Thank you. All right. Thank you very much. Mr. Gisille. May it please the Court, Muhammad Gisille on behalf of Governor DeSantis and Secretary Lee. Your Honors, I'd like to begin by responding and making one overarching point to my friend's comments, and then systematically addressing the 14th Amendment, the 19th Amendment, and the factual issues in this case. Your Honor, the overarching point is this. To me, my friend's argument seems to be that we are turning equal protection concepts on their head and creating an exception from both Amendment 4 and this Court's en banc decision for a class of felons based on two characteristics, gender and wealth. And that, to me, seems to be inconsistent with the notions of equal protection and would be an anomalous result. Your Honor, turning to the 14th Amendment arguments, my understanding of my friend's comments in the briefs is that they're asking the Court to apply one of two, what they see as exceptions to the plead and prove intent requirement. The first is the Anderson-Burdick test, and the second is the reproductive rights line of cases. Your Honor, Anderson-Burdick, as this Court made clear in Jacobson, is not a constitutional catch-all. It applies when the right to vote is at stake, and that's consistent with Justice Scalia's concurring opinion in Crawford. In addition, Your Honor, one way to look at the Anderson-Burdick test is that it looks to see how you exercise a franchise, not whether you have the right to the franchise. And I think that's an important distinction because if we collapse the concepts and say that Anderson-Burdick applies both to how you exercise a franchise and whether you exercise a franchise, what we would be doing is looking at felon disenfranchisement and felon reenfranchisement through a lens where we have an absolute bar on voting. And if there's an absolute bar on voting and we're applying the Anderson-Burdick test, how then can the state justify the bar? My answer is probably not. You can't, Your Honor. Because you probably shouldn't. Well, Your Honor, but the thing is it runs – Tell me, aside from the felon scenario, tell me a scenario where the state can flat-out ban voting by an eligible person. You cannot, Your Honor – And it's not a problem. Yes, Your Honor, but here's where it runs into a problem. If we say that if felon reenfranchisement scheme fails Anderson-Burdick, what we're essentially doing is overruling Richardson and its interpretation of Section 2 of the Equal Protection Clause because we're saying – For me, I think you've got the better of the argument on precedent. If I were writing on a blank slate, maybe not. But given the precedent we have, I think, as I told Ms. Abudo, I think you've got the better of the argument. Having said that, we have cases that say that when you are challenging a burden on voting, you don't apply a discriminatory intent test. Now, those are not felon cases, right? So that's why I think you've got the better of the argument. But here's a quote from our Lee decision in 2019. Plaintiffs need not demonstrate discriminatory intent because we are considering the constitutionality of a burden on the fundamental right to vote. So we have voting cases where we do not apply a discriminatory intent requirement. That goes back to the city of Mobile, Alabama case in 1970, what, 7 or 8, something like that. Yes, Your Honor. I didn't mean to interrupt. We held you had to have intent in Congress. In the Supreme Court, we said it was an effects case. The Supreme Court said it's an intent case, citing Washington v. Davis and the rest. And Congress made it an effects case under the Voting Rights Act. Yes, Your Honor. And that's what we have here. No, Your Honor, you do not. And Judge Jordan, the state's position has been for the voting rights cases, we do need to have— You're just relying on precedent. Yes, Your Honor. And the final point is just going back to the en banc decision from this court in Jones 2, on pages 1030 to 1031, the court distinguishes the Harper case in an equal protection context. And the court discusses how Harper is distinguishable because there you had the right to vote at stake. You had eligible voters who were having burdens imposed on them, whereas in this case, Jones 2, you had folks who did not quite cross the threshold to become re-enfranchised and trigger the right to vote analysis. So, Your Honor, I'll rest on that argument and those line of precedence. Right, but Jones did not address, for all of the issues it did address, Jones did not tackle a disparate impact argument. There was no disparate impact claim in Jones, right? There was no disparate impact claim in Jones 2. However, there was a disparate impact analysis in Judge Hinkle's district court order on a racial basis, which was never appealed. So— Right, so that's persuasive but not binding. Yes, Your Honor. So second is a reproductive rights line of cases. And there, I would simply note that those are sui generis. To my knowledge, they've never been extended beyond that context. And more importantly, Your Honor, those cases are imbued with concerns about the right to privacy in the numbers of the First, Third, Fourth, and Seventh Amendments. And Ninth. And the Ninth, Your Honor. And those aren't at stake here. This case is not imbued with those similar concerns, and so that line of cases ought not to be extended. So we're back to the 14th Amendment axiom that to plead and prove a 14th Amendment case, one ought to have intent and effect. And my friends for the plaintiffs did not plead or prove intent. Let me—I didn't ask Ms. Abudu about this, but I will when she gets back up. But I want you to have the chance to address it too. Judge Hinkle ruled that even if disparate impact were the standard and you didn't have to show discriminatory intent, there was no disparate impact shown here because black women were not suffering the brunt of the effects of Amendment 4 and its implementing legislation. That everything, the scheme, was disproportionately affecting men, black men, more than women. So I'd like you to speak to that. Yes, Your Honor. And we've come—we made the argument in our papers that that was a factual finding by Judge Hinkle based on the record. It appears on pages 93 and 94 of Judge Hinkle's order. And Judge Hinkle notes that on the facts, the plaintiff's theory is that women with felony convictions, especially those who have served prison sentences, are less likely than men to obtain employment and, when employed at all, are likely to pay substantially less than men. The problem is even worse for African-American women. This pattern is not limited to felons. It is true of the economy at large. And then Judge Hinkle goes on to conclude, based on the facts, that there's not a disparate impact here. Now, Your Honor, I believe that that factual finding is entitled to deference for a few reasons. Number one, if we look at the operative complaint in this case, which is the First Amendment complaint, and it appears on page 80 of the supplemental appendix, and we read the paragraphs, it's unclear what it is the plaintiffs want us to compare to what baseline. Sometimes it is all women versus all felons. Sometimes it is all women of color, which is defined either as black women, Hispanic women, or both, against all white felons. Sometimes it's the group compared to all white women. And, Your Honor, this material is in the record in ECF 318-2 and 318-1. Those are the expert reports from Dr. Walker and Dr. Weinstein. Dr. Walker's report on page 2 adds to the confusion. The initial brief that my friend filed in this case, pages 15 to 16, has bullet points where, again, it's unclear what group is being compared to what baseline. And if the fundamental point being made on appeals Judge Hinkle erred in his factual determination because he got the wrong group comparing it to the wrong baseline, with due respect, Judge Hinkle had before him the record he did, and he had the cross-examination of Dr. Walker, which is on the supplemental appendix, page 1032-42. We're looking at two exhibits, ECF 361-1 and 361-2. Judge Hinkle saw that the felon population in Florida has 7% women, 93% men, from 2009 to 2015. How do we reach that issue given the precedent we have? Your Honor, what I'm saying is that even if we— I mean, how do we get there? Your Honor, I'm arguing that this is the narrowest possible grounds to affirm here because Judge Hinkle has concluded that even if the plaintiffs are right, that they don't need to plead and prove intent for 14th Amendment— Do you want us to rule on the effects issue? Your Honor, I'm just saying— Really? No, Your Honor. But you were answering my question, so— Yes, Your Honor. I'm answering your question. I'm pointing out that there's— I understand that. I just— There's a very narrow factual ground to affirm here based on Judge Hinkle's factual findings that men are affected, not women. And— The way you would write that opinion is to say even assuming without deciding that the plaintiffs are right, that in this unique factual circumstance, discriminatory intent need not be proven, the district court's factual finding on disparate impact was not clearly erroneous, affirmed. Yes, Your Honor. So it's essentially Judge Hinkle's discussion with the conclusion that Judge Hinkle did not commit clear error. And, Your Honor, on the 19th Amendment point, I would like to note that we have the text of the 19th Amendment, which the courts have recognized is nearly identical to the 15th Amendment. And if we are now going to divert from that text and say that that text means something else for the 19th Amendment purposes than it does for the 15th Amendment purposes, we're creating a constitutional deviation, a branch that I believe is unsupported. There is a way. I'm not sure it works in this case, but there is a way. And there's a textualist way. And the way is that if the language of words change over time, so by the time the words are repeated at a later point, the words mean something different. If you have that sort of scenario and you are following a pure textualist pedigree, there's a valid way to figure out that the two amendments mean something different and maybe even radically different. Like I said, I'm not sure that's the case here, but there is a way. Fair enough, Your Honor. My friend touched on the 26th Amendment, and I will concede that the 26th Amendment also uses the on-account-of phrase, which I know of at least two district court opinions, one in the Northern District Judge Walker Florida early voting case and one in Wisconsin, again, a case involving IDs for college students. On-account-of was considered in the 26th Amendment context, 26th Amendment coming after the 19th, and both district court judges looking at the text, the history, came to the conclusion that it requires an intent requirement. In the Wisconsin case, I believe the prohibition was upheld. In the Florida case before Judge Walker, the prohibition was struck down, applying Arlington Heights in the circumstantial intent test. Your Honor, finally, on the 19th Amendment, I would like to point the Court to the en banc court's discussion on pages 1040 to 1043, where the en banc court also recognizes that the text of the 15th and 19th and 26th is nearly identical. The 24th was different, and therefore, the en banc court in Jones 2 had a separate analysis of the by reason of discussion in the 24th Amendment, contrasting it with the on-account-of discussion for the 14th, the 15th, the 19th, and the 26th. Your Honor, unless there are other questions, I have nothing further to add, and I yield my time. All right, thank you very much. Thank you, Your Honor. I can, Judge Jordan, pick up on the question you posed to my friend in terms of Judge Hinkle's factual findings, and we would submit that those factual findings are the only confusing thing in the record. Why is it confusing? It's confusing, Your Honor, because, number one, Judge Hinkle first recognizes that African-American women definitely fare the worst in terms of this current regime that Senate Bill 7066 erects. And then the district court turns around and decides that, based on plain, raw numbers, because there are, in the raw sense, more men in the criminal justice system than women, that they obviously must be more disparately impacted, which I would submit just cannot be right, given that we know that there are also more white people in the criminal justice system in terms of raw numbers. What's the comparative group to black women? The comparative group for black women is every other category of people in the criminal justice system. That's why the expert reports from Dr. Walker and Dr. Weinstein were so exhaustive in terms of making sure that there were not just anomalies. So white, what are the statistics about white women who are felons? White women in terms of their rates of employment, for example, I believe the statistics were about 73% or so, or 73 cents on the dollar to about 56 cents or so on the dollar that black women make. And then, of course, for white women, or I'm sorry, for white men, they are at the top. Black men and Latin or Hispanic men kind of in the middle. But no question, when you look at every indicator, that black women are at the bottom. Now, we maintain that we were not required to prove intentional discrimination under either the 14th Amendment, Equal Protection Claim, or the 19th Amendment. But to the extent that this court believes that intentional discrimination in how Senate Bill 7066 operates, we believe we've established that as well. Again, you can look to Dr. Weinstein's expert report in which she says that there is no other explainable factor for why African-American women continue to make less than any other category, but for gender discrimination, racial discrimination, and the combined impact of those two forms of discrimination on that particular category of people. The relevance of that is that Senate Bill 7066 requires payment of money, of a fee, that our clients did not have the money to satisfy before they went into prison, do not have the money to satisfy now, and have presented ample evidence showing that they continue to struggle because of the factors that Dr. Weinstein identified in her expert report struggle to maintain even a living wage, let alone be able to satisfy solely for the purpose of voting the financial obligations that they owe. I'd also like to emphasize the language on account of in the 19th Amendment because in this court's decision in Jones 2, the court recognized that on account of is more properly compared to or associated with a but for cause, not an intentional discrimination. Therefore, that means that we did not have to establish that Governor DeSantis is a misogynist or that he is a racist. All we had to establish is that the law that the state of Florida enacted will have a disparate impact or oppose, in the language of the 14th Amendment, an undue burden on our clients when it comes to their ability, like other people who have criminal convictions and OLFOs. What do you have to show to make out a disparate impact claim? Put aside this scenario. What do you have to show in terms of the burdens on a group compared to a comparative group? What's the baseline in the case law? In the case law, again, if we look to Crawford and we look to Anderson-Burdick line of cases, the basis is what is the level of access? Are the different categories of voters on equal footing when it comes to being able to satisfy the voter qualification? And we have satisfied or proven, Your Honors, that our clients are not for all of the reasons that exist in the employment context. But there are a lot of felons in Florida who are not black women, who are unable to satisfy their LFO obligations. And there are a lot more of them who are not black women in Florida. So in light of those two things, how can the district court's factual finding be clear error? It's clear error because based on that statement, Your Honor, that is focused solely based on wealth, which is an issue that could cross race, racial divides. But in our case, we are essentially forcing the court not to. But you're using comparators as white women, too. So you're crossing gender divides as well. You're not just comparing black women to men. When I asked you the question, you said everybody else who's not a black woman. Well, that's because our clients are black women. I know, but that's the claim you're bringing. And so you're comparing part of the comparative group includes white women. So that has the gender issue, too. And that's part of the comparative class that you've sort of brought up. But the problem, unfortunately, I realize I'm out of my time, is that when we look at the rates of employment and economic status between white women and black women, there is a significant disparity there as well, which is why we also focus on the race of our plaintiffs or our clients and not just on their wealth or on their gender. Again, that the multiple identities have to be taken into consideration, which again is why an undue burden standard should apply to both the Equal Protection and 19th Amendment claims. And that at the very least, that this case should be remanded so that the district court can have an opportunity to apply the correct legal standard to the facts that were presented to the court. Thank you. All right. Thank you both very much. We will take a five minute break to set up for our final case.